# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1329 | **DATE** | 1/5/2004 |
| **CASE TITLE** | John Payne and Paula Payne vs. Ken Diepholz Ford Lincoln Mercury, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [27-1] denied on all counts. Plaintiff's cross motion for partial summary judgment [40-1] granted on Counts I and II and denied on Count IV. Trial remains set for 2/17/04 with final pretrial materials to be submitted to chambers not later than 1/23/04. Final pretrial conference is set for 1/30/04 at 3:00 p.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JAN 0 6 2004 date docketed | 44 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 1/5/2004 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| MD courtroom deputy's initials | | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN PAYNE and PAULA PAYNE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 02 C 1329 |
| ) | Judge Joan H. Lefkow |
| KEN DIEPHOLZ FORD LINCOLN ) | |
| MERCURY, INC., ) | |
| ) | |
| Defendant. ) | |

DOCKETED
JAN 06 2004

## MEMORANDUM OPINION AND ORDER

Plaintiffs, John Payne and Paula Payne ("the Paynes"), filed a four-count complaint against defendant, Ken Diepholz Ford Lincoln Mercury, Inc. ("Diepholz Ford")[1], an automobile dealership, alleging violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505. Before the court are Diepholz Ford's Motion for Summary Judgment on all four counts and the Paynes' Cross Motion for Partial Summary Judgment on Count I, II, and IV. For the reasons set forth below, the court denies Diepholz Ford's Motion for Summary Judgment on all counts. The court grants the Paynes' Cross Motion for Partial Summary Judgment on Counts I and II and denies the Paynes' Cross Motion on Count IV.

---

[1]Throughout, Ken Diepholz Ford Lincoln Mercury, Inc., the car dealership, is referred to as "Diepholz Ford," while Ken Diepholz, the individual, is referred to as "Diepholz." John and Paula Payne are referred to by their given names.

1

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

Diepholz Ford is an automobile dealership in Effingham, Illinois. (Def. L.R. 56.1 ¶ 2, 3.) Diepholz Ford "attempt[s] to help customers obtain financing on a regular basis." (Pl. St. of Add'l Facts ¶ 46.) Diepholz Ford uses customers' credit ratings to determine to which lenders it will submit a customer's credit application for financing. (*Id.* ¶ 48.) In arranging financing for its customers, Diepholz Ford employees engage in "rehashing." This is a process where the

2

Diepholz Ford employee negotiates the terms of financing with a finance company. (*Id.* ¶ 51.)
Once the lender states the interest rate at which it will extend financing to the customer, Diepholz Ford has the discretion to set a higher interest rate. (*Id.* ¶ 52.)

In mid-February, 2001, Paula Payne received a direct mailing from Diepholz Ford. (Pl. St. of Add'l Facts ¶ 19-20.) The mailing, addressed to Paula specifically, stated that she had been

> pre-selected to receive approval for an ***auto loan of up to $19,500\* with little or no cash down* . . . *You must bring this letter,*** any trade-in, all decision makers and be ready to drive home in your new vehicle. . . . P.S. This will be the only notice you will receive. Failure to respond on or before above date's [*sic*] will result in termination and cancellation of your Pre-Qualification of up to $14, 5000.

(*Id.* ¶ 21.) The mailing also included an "Instant Loan Certificate" bearing Paula's name and address, and stating, "ELIGIBLE UP TO $19,500.00" and "PRESENT FOR IMMEDIATE PROCESSING." (*Id.* ¶ 22.)

In response to the mailing, Paula went to Diepholz Ford to purchase a vehicle on February 21, 2001. There she met Josh Stone, a Diepholz Ford salesman. (*Id.* ¶ 24.) After Paula selected a 1998 Ford Explorer, Stone took Paula to an office where Stone filled out an application for financing based on information provided by Paula. (*Id.* ¶ 25.) Paula then signed the application. (*Id.* ¶ 27.)

Diepholz Ford then pulled Paula's credit report. (*Id.* ¶ 26.) Soon afterward, Paula met with Diepholz Ford finance manager Tony Mason ("Mason"). (*Id.* ¶ 27.) Mason is the "custom finance manager" at Diepholz Ford, which is "the finance manager that obtains loans for people who have had credit problems in the past." This position differs from the job of "finance manager" because Mason deals with "secondary lenders" that require more extensive

3

documentation. (*Id.* ¶ 57.) Mason asked Paula why her husband's name was not on the credit application. Paula referred to the direct mailing she had received from Diepholz Ford, which was addressed directly to her and said that she wanted to get the car in her own name. Mason informed her that "it wouldn't go through" in just Paula's name. Paula again referred to the direct mailing that she had received, but Mason again responded that the application "just won't" go through without her husband's credit information. (*Id.* ¶ 27.) In his deposition, Diepholz testified that Paula could not be financed alone because she had an outstanding automobile loan. (*Id.* ¶ 36.) Paula then provided John's credit information. (*Id.* ¶ 27.) She signed the credit application. (Paula Payne Dep. at 35.) After Paula waited approximately ten minutes, Mason informed her that he "didn't have an answer yet" and that Paula could go home and call Diepholz Ford later that afternoon to check on the status of her application. (*Id.*)

Later that day, Paula called Mason. Mason stated that the loan had been approved and invited Paula to come back to Diepholz Ford. Paula informed Mason that she would be back on Saturday, February 23, 2001. (Pl. St. of Add'l Facts ¶ 28.) On February 23, Paula and John went to Diepholz Ford and spoke with Mason. Mason presented the Paynes with a Retail Installment Contract ("RIC") that stated that Household Automotive Finance Corporation ("Household") was the assignee of the RIC to whom installment payments could be made. The RIC contains a "Federal Truth in Lending Disclosure Statement" that states as Annual Percentage Rate of 20.95% and states that the payments would be $369.53 per month for sixty months. The RIC is dated February 23, 2001, and is signed by the Paynes and Diepholz. (*Id.* ¶ 30.) The Paynes also signed an "Affidavit of Spot Delivery" ("Affidavit"). The Affidavit stated,

> I understand that if the transferor is unable to obtain credit approval on my loan within ten business days, and if I am unable to obtain financing on my own within 24 hours after notification from the transferor that my loan had been denied, I will be required to bring back the vehicle to the transferor.

The Affidavit also contained spaces in which to identify the year, make, model, and vehicle identification number of the vehicle, the amount of earnest money to be deposited by the transferee, the dealership name, the transferor's signature, and the date. All of these spaces were left blank. (Def. Mot. for Summ. J., Ex. L.) The Paynes paid $1,000 as a down payment and traded in their 1994 Mercury Cougar. (Def. Mot. for Summ. J., Ex. B.)

At some point, John was asked to submit a driver's license. (*Id.* ¶ 29; Paula Payne Dep. at 21, 27-29.) John did not have his license with him that day. Paula told Mason that she would produce a copy of John's driver's license at a later date. (Paula Payne Dep. at 27.) Mason told the Paynes that they had been approved by Household for the purchase of the Ford Explorer. (Pl. St. of Add'l Facts ¶ 31.) In fact, Diepholz Ford had not yet obtained financing for the Paynes' purchase. Household had only conditionally approved the Paynes' application in a faxed notice dated February 27, 2001, four days after the RIC was signed. (*Id.* ¶ 32.) Nevertheless, the Paynes drove away with the Ford Explorer, leaving their Mercury Cougar as a trade in. (*Id.* ¶ 33.)

A few days after February 23, 2001, Mason spoke with Paula and said he needed John to sign a credit application. Paula informed him that John was working, and Mason told Paula that she could sign it instead. Paula then went to Diepholz Ford and signed John's name to a blank credit application. (Paula Payne Dep. at 37.) Diepholz Ford then sent John's credit application to Household indicating that John's driver's license would follow. (Def. L.R. 56.1 ¶ 8.)

5

Within a week of February 23, 2001, Paula Payne took the vehicle back to Diepholz Ford for repairs. At this time, she brought a copy of her husband's driver's license–an expired Texas license–and gave it to Mason. (Paula Payne Dep. at 27-28.) A few days later, Mason telephoned Paula and said that Diepholz Ford "couldn't use [John's license] or they wouldn't accept it or something." (*Id.* at 29.) Mason informed Paula that she could provide a copy of her son's driver's license instead of John's. (Pl. St. of Add'l Facts ¶ 34.)

About two or three weeks after taking possession of the Ford Explorer, Mason informed the Paynes that the loan for which they had applied could not be processed. (*Id* ¶ 40; Paula Payne Dep. at 42.) Mason explained that because the Paynes already had one car loan, their loan could only be approved if they provided two driver's licenses. (Paula Payne Dep. at 42.) Paula claims that she attempted to return the Ford Explorer and recover her Mercury Cougar on at least two occasions. Each time, Diepholz Ford refused to take possession of the Ford Explorer or return the Mercury Cougar. (Pl. St. of Add'l Facts ¶ 40.) Diepholz Ford claims that on several occasions after February 23, 2001, Diepholz Ford employees offered the Paynes the return of their down payment and trade-in vehicle if they would return the Ford Explorer, but the Paynes refused, stating that they wanted to proceed with the transaction. (Halley Aff. ¶ 12; Mason Aff. ¶ 12.) Diepholz Ford contends that the Paynes continued to promise that they would provide a valid driver's license for John. (Def. L.R. 56.1 ¶ 15.) On March 20, 2001, Mason informed Paula that Diepholz Ford had sold the Mercury Cougar. (Paula Payne Dep. at 51.) Diepholz claims that Paula stopped payment on the $1,000 down payment check, but does not know if that was before or after Paula found out that Diepholz Ford had sold the Mercury Cougar. (Diepholz Dep., at 60.)

Diepholz claims that, after the situation was brought to his attention, he contacted Ford Motor Credit and arranged financing for the Paynes on the terms specified in the original RIC. He claims that he contacted Paula and told her, "I've got everything taken care of. You're approved with Ford Motor Credit by yourself with exactly the same terms.[2] All you need to do is come in and sign." He claims that Paula's response "verbatim" was "My attorney advised me not to sign anything." (Diepholz Dep. at 55-57.)

The Paynes have never received anything in writing regarding any actions taken on their credit applications. (Pl. St. of Add'l Facts ¶ 56.) As of April 25, 2003, the Paynes still possessed the Ford Explorer and had not made any payments pursuant to the RIC signed on February 23, 2001. (John Payne Dep. at 39.)

## DISCUSSION

### I. Count I: Equal Credit Opportunity Act

Section 1609(d)(2) of the ECOA entitles credit applicants to a written notification of the denial of credit and a statement of the reasons for such actions. 15 U.S.C. §1691(d)(2). The Paynes allege that Diepholz Ford violated § 1691(d)(2) by failing to notify the Paynes in writing that their credit application had been denied. Diepholz Ford argues that it is not covered by §1691(d)(2) because it is not a "creditor" as defined by the ECOA. In addition, Diepholz Ford argues that the Paynes have failed to establish a violation of the ECOA because the Paynes did not provide the necessary paperwork–a valid driver's license for John Payne–to allow Household to process their credit application. Both parties move for summary judgment on Count I.

---

[2]Later in his deposition, Diepholz corrected this statement, saying that the approval from Ford Motor Credit was for both Paula and John Payne. (Diepholz Dep. at 57.)

7

Under the ECOA, the term "creditor" means "any person who regularly extends, renews, or continues credit [or] any person who regularly arranges the extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(e). Regulation B, the ECOA's implementing regulation, further defines "creditor" as "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of credit .... [t]he term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors...." 12 C.F.R. § 202.2(l). Numerous cases have held that automobile dealerships may be creditors under the ECOA. *See, e.g., Gallegos v. Rizza Chevrolet, Inc.*, No. 03 C 4237, 2003 WL 22326523 (N.D. Ill. Oct. 9, 2003)("Auto dealers may qualify as creditors" under the ECOA.); *Mungia v. Tony Rizza Oldsmobile, Inc.*, No. 01 C 460, 2002 WL 554504 (N.D. Ill. April 15, 2002)(automobile dealership covered by ECOA because it was involved in obtaining or arranging for credit on behalf of consumers); *Burns v. Elmhurst Auto Mall, Inc.*, No. 00 C 5732, 2001 WL 521840 (N.D.Ill. May 16, 2001)(vehicle dealer was a creditor under ECOA because it regularly referred applicants to creditors and selected creditors to whom such applications would be made). Like the dealers in these cases, Diepholz Ford "attempt[s] to help customers obtain financing on a regular basis." It selects lenders to which it will submit customers' credit applications, negotiates the terms of financing for its customers, and has the discretion to set a higher interest rate than the lender requires. Thus, Diepholz Ford is a creditor as defined by the ECOA.

The ECOA provides that

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by--
(A) providing statements of reasons *in writing* as a matter of course to applicants against whom adverse action is taken; or

> (B) giving *written notification* of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. §1691(d)(2)(emphases added). Regulation B makes it clear that the notice requirements apply to adverse actions taken because an application is incomplete.[3] The ECOA defines an "adverse action" in relevant part as "a denial or revocation of credit, . . ." 15 U.S.C. § 1691(d)(6). The Paynes applied for financing for the purchase of a Ford Explorer. Diepholz Ford admits that the Paynes application was denied because it was incomplete–John Payne had not supplied a valid driver's license. However, Diepholz Ford did not provide the Paynes with a written notice of the denial of their application or of the reasons for that denial. Thus, Diepholz Ford violated §1691(d)(2).

*Johnson* v. *Grossinger Motorcorp, Inc.*, 324 Ill. App. 3d 354, 753 N.E.2d 431 (1st Dist. 2001), on which Diepholz Ford relies, is distinguishable from this case. In *Johnson*, the car dealership provided the plaintiffs with a written list of the documents required to obtain financing. The plaintiffs failed to provide all of the required documents and were denied credit for that reason. The court ruled that the written list satisfied the ECOA's requirement of written notification. *Id.* at 367, 753 N.E.2d at 441-42. Here, there is no evidence that Diepholz Ford ever provided the Paynes with a written list of required documents or a written explanation of

---

[3] Section 202.9 of Regulation B provides that "a creditor shall notify an applicant of action taken within . . . (ii) 30 days after taking adverse action on an incomplete application, unless notice is provided in accordance with paragraph (c) of this section." Paragraph (c) applies to applications made entirely by telephone. 12 CFR § 202.9(a)(1)(ii) & (c)(2).

9

why their application for credit was incomplete. Diepholz Ford's Statement of Facts asserts only that Diepholz Ford requested a valid driver's license from John Payne in "numerous phone calls and direct conversations." (Def. L.R. 56.1 ¶ 13.) Thus, the court denies Diepholz Ford's Motion for Summary Judgment on Count I and grants the Payne's Cross Motion for Summary Judgment on Count I.

## II. Count II: Fair Credit Reporting Act

Section 1681m of the FCRA provides that if "any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report," the person must provide notice of the adverse action to the consumer and provide certain information about the consumer reporting agency that furnished the report. 15 U.S.C. § 1681m. It is undisputed that Diepholz Ford did not provide the Paynes with any of the information about the credit reporting agency that supplied it with the Paynes' credit reports. However, Diepholz Ford argues that it was not required to provide the Paynes with such information because it did not take any adverse action against the Paynes based on any information contained in a credit report.

The Paynes point to two instances that they contend constitute adverse actions against them. First, the Paynes argue that Diepholz Ford took an adverse action against Paula Payne by refusing to submit her individual credit application to Household after sending her the direct mailing purporting to offer her credit. The Paynes also contend that Diepholz Ford took an adverse action against them by submitting their credit applications to Household, a "secondary lender" that requires extensive documentation from credit applicants, rather than a prime lender that would not have required the submission of a valid driver's license. In both instances, the

10

Paynes contend that Diepholz Ford took these adverse action against them based on information obtained from their credit reports. Thus, the Paynes argue that Diepholz Ford violated § 1681m. Both parties move for summary judgment on Count II.

The FCRA defines an "adverse action" to include "a denial or revocation of credit . . . or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). More broadly, an adverse action includes "any action taken or determination that is . . . adverse to the interests of a consumer." 15 U.S.C. § 1681a(k). Diepholz Ford clearly took an adverse action against Paula Payne when it refused to submit her individual credit application to a lender as she requested and instead required her to apply for credit jointly with her husband. Diepholz Ford admits that it took this action because Paula's credit report revealed that she had an outstanding automobile loan. Thus, § 1681m required Diepholz Ford to provide Paula with information about the consumer reporting agency that furnished the report. Diepholz Ford failed to do so and thus violated § 1681m.[4] For this reason, the court grants the Paynes' Cross Motion for Summary Judgment on Count II.

### III. Count III: Truth in Lending Act

The TILA requires, among other things, that a creditor in a consumer credit transaction disclose to a consumer certain details of the terms of the financing agreement. 15 U.S.C. § 1638(a). For instance, the creditor must disclose the amount of money financed, the

---

[4]The Payne's have failed to show how Diepholz Ford's decision to submit their credit application to Household and not some other lender constitutes an adverse action. While Household may be a "secondary lender," the only "adversity" the Payne's have identified that they suffered as a result of Diepholz Ford's decision to submit their application to Household was the requirement that John Payne produce a valid driver's license. The Paynes have cited no case law holding or even suggesting that a creditor that requires a valid driver's license from an applicant for an automobile loan has taken an adverse action against the applicant. Thus, the court finds that Diepholz Ford's decision to submit the Paynes' application to Household did not constitute an adverse action under the FCRA.

11

borrower's right to obtain a written itemization of the amount financed, and the finance charge. *Id.* Under the TILA and its implementing regulation, Regulation Z, 12 C.F.R. § 226.17, these disclosures must be made "clearly and conspicuously in writing, in a form the consumer may keep," and the disclosure must take place "before the consummation of the transaction." 12 C.F.R. § 226.17(a) and (b). The Paynes allege that Diepholz Ford violated the TILA and Regulation Z by failing to accurately and timely deliver the required material disclosures in a form the Paynes could keep before the consummation of the transaction. Specifically, the Paynes argue that, because financing was not obtained at least until one month or more after the RIC was signed, the Annual Percentage Rate, which was calculated based on the duration of the RIC, was inaccurate. Diepholz Ford contends that it did not violate the TILA or Regulation Z because the credit transaction was never consummated due to John Payne's failure to provide a valid driver's license. Therefore, Diepholz Ford moves for summary judgment on Count III.

Diepholz Ford relies on *Johnson v. Grossinger Motorcorp., Inc.*, 324 Ill. App. 3d 354, 753 N.E. 2d 431 (1st Dist. 2001), to support its argument that the transaction between it and the Paynes was not consummated because of the Paynes failure to provide a valid driver's license for John. In *Johnson*, the plaintiff argued that the defendant car dealership violated the TILA because the annual percentage rate and finance charges disclosed on the RIC were not accurate because the dealership did not extend credit to the plaintiffs on the date the RIC was signed. Though the appellate court's reasons for affirming the trial court's grant of summary judgment for the defendant is not clear, the court apparently accepted the defendant's argument that the RIC was never completed due to the plaintiff's failure to provide the necessary documentation. *Id.* at 365, 753 N.E. 2d at 440.

12

The facts in *Johnson* are distinguishable from those in the instant case. In *Johnson*, the plaintiffs initialed a "Rider to Purchase Contract/Lease Contract" that contained the following language:

> The purchase contract and retail installment contract may be canceled at any time by [defendant], if [defendant] determines that it cannot obtain third party approval and may be canceled by either party within 21 days if third party approval is not obtained on the agreed terms.

*Id.* at 357, 753 N.E. 2d at 434. Because the plaintiffs failed to provide the necessary documentation, the defendant could not obtain third party approval for financing and thus had a right to cancel the RIC. Thus, the credit transaction was not consummated.

Here, there is nothing in the RIC suggesting that the consummation of the transaction was conditioned on John providing a valid driver's license or on Diepholz Ford obtaining third party financing for the Paynes. In fact, in the course of arguing a separate issue, Diepholz Ford accuses the Paynes of "fail[ing] to make a single payment on the vehicle *in violation of the Retail Installment Contract*." (Def. Memo. in Supp. of Mot. for Summ. J., at 9, emphasis added.) The Affidavit of Spot Delivery, which contains language requiring the Paynes to return the vehicle if Diepholz Ford failed to obtain third party financing, was not completed, failing to refer to the subject matter of the sale, the seller, or the date. Thus, there remains a genuine issue of material fact as to when, if ever, the transaction between Diepholz Ford and the Paynes was consummated. For these reasons, the court denies Diepholz Ford's Motion for Summary Judgment on Count III.

### IV. Count IV: The Illinois Consumer Fraud Act

In their Complaint, the Paynes state that "the furnishing of the vehicle to Plaintiffs was conditioned on Plaintiffs providing credit references or having an acceptable credit rating. . . .

Plaintiffs' credit application was rejected by [Diepholz Ford]. . . . Thereafter, [Diepholz Ford] did not return any part of Plaintiffs' cash down payment or trade-in vehicle." The Paynes also state that Diepholz Ford "concealed material information from Plaintiffs." The Paynes contend that this conduct violates the ICFA, 815 ILCS 505/2 and 505/2C. Both parties move for summary judgment on Count IV.

In their Response to Diepholz Ford's Motion for Summary Judgment, the Paynes assert two discrete claims under the ICFA. First, the Paynes contend that the direct mailing that Diepholz Ford sent to Paula Payne was deceptive and induced her to come to Diepholz Ford and to trade in her Mercury Cougar, which Diepholz sold. However, as Diepholz Ford correctly points out, "nowhere in plaintiffs' complaint is it alleged that defendants committed a deceptive act through an advertisement." (Def. Reply in Supp. of Mot. for Summ. J., at 1.) While the lenient notice pleading standards of Rule 8 of the Federal Rules of Civil Procedure sometimes may allow a plaintiff raise arguments based on facts not alleged in the initial complaint, this is not true when the plaintiff alleges fraud. Rule 9(b) requires a plaintiff alleging fraud to plead with particularity the factual basis for the allegation, including: "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir.1997) (citation omitted). "Claims brought under the ICFA must meet the same heightened pleading requirements of Rule 9(b) as common law fraud claims." *Underwriters Laboratories Inc. v. Solarcom LLC*, No.

02 C 3933, 2002 WL 31103476, at *3 n. 5 (N.D.Ill. Sept. 18, 2002). A plaintiff cannot put off making particularized allegations of fraud until summary judgment. Such an approach would thwart the underlying purpose of Rule 9(b) and render it a nullity. *Fiene* v. *V & J Foods, Inc.*, 962 F. Supp. 1172 (E.D. Wis. 1997). Because the Paynes' Complaint does not allege with particularity that Diepholz Ford committed fraud by sending Paula Payne a deceptive advertisement, the court will not consider that argument.

The Paynes' second claim alleges that Diepholz Ford violated Section 2C of the ICFA, 815 ILCS 505/2C, by failing to return the Paynes' down payment and trade-in after their credit application was denied. Section 2C provides that

> If the furnishing of merchandise . . . is conditioned on the consumer's providing credit references or having a credit rating acceptable to the seller and the seller rejects the credit application of that consumer, the seller must return to the consumer any down payment, whether such down payment is in the form of money, goods, chattels or otherwise, made under that purchase order or contract and may not retain any part thereof. The retention by the seller of part or all of the down payment . . . is an unlawful practice within the meaning of this Act, . . .

Diepholz Ford contends that it did not violate section 2C because its employees offered the Paynes the return of their down payment and trade-in vehicle if they would return the Ford Explorer, but the Paynes refused.[5] Because genuine issues of material fact remain regarding whether Diepholz Ford attempted to return the Mercury Cougar and whether Paula stopped payment on the $1,000 down payment check, the court denies both parties' motions for summary judgment on Count IV.

---

[5] Diepholz Ford also argues in its Reply brief that Section 2C does not apply to it because it did not reject the Paynes' credit application. Because Diepholz Ford did not introduce this argument until it filed its reply brief, the court deems it waived. *See Fenster* v. *Tepfer & Spitz, Ltd.*, 301 F.3d 851, 859 (7th Cir. 2002)("An argument introduced for the first time in a reply brief is waived.").

## ORDER

For the reasons set forth below, Diepholz Ford's Motion for Summary Judgment is denied on all counts (#27). The Paynes' Cross Motion for Partial Summary Judgment is granted on Counts I and II and denied on Count IV (#40). Trial is set for February 17, 2004. Final pretrial materials shall be submitted to chambers not later than January 23, 2004. In the meantime, the parties will be referred to the designated magistrate judge for a settlement conference. A final pretrial hearing is set for January 30, 2004, at 3:00 p.m.

Enter: *[signature]*
JOAN HUMPHREY LEFKOW
United States District Judge

Date: January 5, 2004